# United States District Court

## WESTERN DISTRICT OF TEXAS

FILED
2010 APR -5 AM 11: 52

UNITED STATES OF AMERICA

v.

**DAVID A. DIEHL**

**CRIMINAL COMPLAINT**

CASE NUMBER: A-10-M-268

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about __June 2000__ in __Bastrop__ County, in the __Western__ District of __Texas__ defendant(s) did, (Track Statutory Language of Offense)

use, persuade, induce, entice, and coerce a person under the age of eighteen (18) to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, knowing that such visual depiction will be transported in interstate or foreign commerce, or mailed, or such visual depiction having been produced using materials that have been mailed, shipped, and transported in interstate or foreign commerce by any means, including by computer, or such visual depiction having actually been transported in interstate or foreign commerce or mailed,

in violation of Title __18__ United States Code, Section(s) __2251(a)__

I further state that I am a(n) __Special Agent, Federal Bureau of Investigation__ and that this complaint is based on the following facts:
Official Title

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof.  X  Yes  ___ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

April 5, 2010                          at     Austin, Texas
Date                                          City and State

**ROBERT PITMAN**
**U.S. MAGISTRATE JUDGE**
_____        _____
Name and Title of Judicial Officer              Signature of Judicial Officer

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



**SEALED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § § § | |
| v. | § § | CRIMINAL NO. A-10-M-268 |
| DAVID A. DIEHL, | § § | |
| Defendant. | § § | |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Sean M. Mullen, being duly sworn, state as follows:

### INTRODUCTION

1. I have been employed as a Special Agent of Federal Bureau of Investigation (FBI) since November, 2003. I am currently assigned to the Austin, Texas, Resident Agency of the San Antonio Division. While employed by the FBI I have investigated federal criminal violations related to high technology or cyber crime, sexual exploitation of children, and child pornography. I have gained experience through training at the FBI and everyday work relating to conducting these types of investigations. I have participated in the execution of numerous search warrants for documents and other evidence, including computers and electronic media, in cases involving child pornography and the sexual exploitation of children.

2. This affidavit is submitted in support of a criminal complaint against DAVID A. DIEHL, year of birth 1962, for violations of Title 18, United States Code, Section 2251(a) (Sexual

Exploitation of Children). Title 18, United States Code, Section 2251(a) (2000)[1] provides:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under [18 U.S.C. § 2251(d)], if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

3. This affidavit is based on my personal knowledge as well as reports made by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of the complaint, it does not contain every fact known to me or other agents of the Federal Bureau of Investigation.

## STATUTE OF LIMITATIONS

4. To the best of my knowledge and belief, as set forth later in this Affidavit, there is probable cause to believe that the earliest known child pornography offense under investigation occurred in or about 2000. Although nearly 10 years has passed since the earliest known offense, the statute of limitations has not yet expired for that or subsequent offenses. The following "timeline" of amendments to the statute of limitations applicable to child pornography offenses (the dates indicate the effective date of applicable amendments) is provided:

---

[1] Because the offense charged in the Complaint is alleged to have occurred in or about June 2000, the 2000 version of this statute is quoted. The current language of that statute is substantially similar.

a. **Prior to November 29, 1990** – Statute of limitations was five years.

b. **Effective November 29, 1990** – Statute of limitations for an offense that "involve[s] the physical or sex abuse of a child" is tolled until the victim reaches age 25 (18 U.S.C. § 3509(k))

c. **Effective September 13, 1994** – Section 3509(k) is re-codified as 18 U.S.C. 3283.

d. **Effective April 30, 2003** – Statute of limitations for an offense that involved the physical or sex abuse of a child runs for the life of the child (18 U.S.C. § 3283).

e. **Effective January 5, 2006** – Statute of limitations for an offense that involved the physical or sex abuse of a child expires 10 years after the offense or runs for the life of the child, whichever is longer (18 U.S.C. § 3283).

f. **Effective July 27, 2006** – Statute of limitations is eliminated for child pornography, sex trafficking, sex abuse, and traveler offenses (now codified in 18 U.S.C. § 3299).

5. Applying the foregoing to the earliest known child pornography offense under investigation:

a. The statute of limitations in 2000 provided that a prosecution for an offense that involved the physical or sex abuse of a child could be brought until the victim reaches age 25. In 2000, the victim of the instant offenses was 11 years old. Accordingly, under the 2000 version of the statute, the limitation period would not expire until in or about 2014 when the victim reached age 25.

b. As of the date of the 2003 amendment, the statute of limitations on the instant offenses had not yet run, and the limitation period was extended to 10 years after the offense, or the

life of the child, whichever is longer. Accordingly, the statute of limitations would not expire until 2010 or the death of the victim.

        c.      As of the date of the 2006 amendment, the statute of limitations on the instant offenses had not yet run because it was only 6 years after the earliest known offense and the victim was still alive. As noted, in July 2006, the limitation period was eliminated for child pornography offenses.

      6.      Accordingly, the child pornography offenses under investigation may be prosecuted and are no longer subject to a limitation period.

## FACTS

      7.      In or about 2005, the National Center for Missing and Exploited Children (NCMEC) received information from the Vancouver Police Department (VPD), Vancouver, Washington, regarding two videos of a minor female being sexually assaulted in what appeared to be a camping tent. NCMEC identified these as videos depicting child pornography and the videos became known as the "Tent" series. As reported by NCMEC, one or both of these videos have been found in the possession of subjects of investigations in over 100 cases.

      8.      I have viewed the two "Tent" series videos, which may be described as follows:

        a.      The first "Tent" series video is approximately 3 to 4 minutes in length. It begins with a close up view of the vagina of what appears to be a prepubescent minor female with a piece of clothing or a sheet covering her head and chest. The female is lying on her back. The video appears to have been taken inside of a camping tent. There is a hand caressing the legs, stomach, chest, and vagina of the female. The hand moves over the female's body and then spreads

her legs to expose her vagina. The female is counting backwards beginning at approximately the number 74. There is a male voice talking to the female. The person talking and touching the female appear to be the same person filming the video. The camera view is from the left side of the female. At times during the video the camera focuses on the vagina of the female. The video then shows what appears to be the same female lying on her back with a towel over her eyes. The female is still counting backwards. The same male voice is heard on the video. The hand of an individual caresses the breast and vagina of the female. Approximately 1 minute and 28 seconds into the video, the camera is directed towards the penis of the male filming the video. The male briefly masturbates then continues to place his hand back on the female. At one point the hand touches the vagina and the female pulls away. The male voice says "got it wet." The female responds "I know." The male then asks "does it feel good?" to which the female responds "no." The male then responds "it does too." The female then begins to count backwards again. The male then spreads the female's legs and she asks "What are you doing?" to which the male responds "I'm playing" as he touches her vagina. The video then shows what appears to be the same female sitting cross-legged in the tent with no clothing on. The video focuses on the vagina of the female at one point. The video then shows what appears to be the same female lying on her back. The leg of the person filming the video appears in the video for a short period next to the feet of the female. The video then focuses on the vagina of the female. The video then shows the same minor female sitting in what appears to be the cargo area of a large vehicle. The female is not wearing any clothing and is holding what appears to be a novelty one million dollar bill. The female takes the bill in her hand and hits her buttocks. The female is then directed by a male voice to "turn around and stick your butt up" to which she does and continues to hit her buttocks with the bill in her hand.

      b.      The second video is also approximately 3 to 4 minutes in length. It begins with the same prepubescent female from the first video sitting cross-legged in a tent with no clothing on. The video focuses on the female's vagina and the male voice says "get your heel mashing your thing." The female then lies on her side and the male voices says "be entertaining." A hand is seen moving the female's legs to the side and the camera focuses on the buttocks of the female. The male voice says "I'm being bad, as usual." The female then lies on her stomach. The camera view is from near the feet of the female and the camera focuses on the female's vagina. The female asks "are you filming this?" The male voice says "quit being shy." The left hand of the person in the video then begins to touch the vagina of the female. The male voice then says "I'm right handed" and begins to use his right hand to touch the female's vagina. At one point, the index finger of the right hand penetrates the vagina of the female and she yells "Ow!" The male voice then says "I won't stick it in." The person then switches hands and begins to touch the female's vagina with the index finger of the left hand. The right hand has a bruise under the ring finger fingernail. There is a reddish type marking, possibly a scar, on the heel of the left hand.

      9.      In or about August 2009, an analyst with the Maine State Police (MSP), informed FBI SA Christopher Thompson that she may have determined a potential location where the "Tent" series videos may have been produced. The MSP analyst described how she identified the potential location:

      a.      A segment of one of the videos shows the inside of a vehicle, which the MSP analyst's research determined to be the interior of a Honda Odyssey or Grand Caravan minivan. Another video segment depicts an Ozarka brand water bottle. The MSP analyst determined that the Ozarka Company has a limited distribution area which includes the southeast and central United

States.

  b. Another video segment depicts a novelty $1,000,000 currency bill. Based on this information, the MSP analyst narrowed the search to states Ozarka distributes to and states in which manufacturers of novelty currency are located. Upon contacting potential manufacturers of the novelty currency, the MSP analyst learned that one manufacturer, The Madow Group, was able to identify the front of the bill in the video and the word "star" on the bill. Using this information, the manufacturer determined that the bill was connected with the Star Ranch, a self-described "nudist club," located in McDade, Texas, in the Western District of Texas, as the single potential matching customer. The manufacturer stated that it produced 500 of these custom novelty $1,000,000 bills for the Star Ranch in 2000, which bills were printed with the words "Star Ranch" on them.

  c. Another video segment depicted the female victim wearing a yellow wristband.

  d. The MSP analyst thereafter telephonically contacted the Star Ranch and spoke with a manager at the Star Ranch. The manager stated that Star Ranch keeps detailed records of members, visitors, camp attendees, vehicles, and wristbands. The manager further stated that Star Ranch distributed yellow wristbands to guests to denote a guest who permitted to have their photograph taken, or in the case of a minor, that the parents agreed to allow photographs of the minor.

  10. On August 19, 2009, FBI agents interviewed an employee at Star Ranch. The employee stated that the Star Ranch hosted the 2000 Southwest Sunbathing Association Conference in June 2000. The employee stated that approximately 400 persons attended the conference. Of

these 400, approximately 200 were Star Ranch members and the remainder were guests. During the interview, the employee was shown a still image of the face of the female minor victim in the "Tent Series" videos and immediately identified her by name (hereinafter referred to as "VICTIM").[2] The employee stated she has known VICTIM and her family since VICTIM was a small child; that VICTIM's family were longtime members of the Star Ranch and would attend nudist activities as a family; and that VICTIM was friends with the employee's children and the families still communicate regularly. The employee stated that VICTIM and VICTIM's family attended the 2000 Southwest Sunbathing Association conference at Star Ranch. The employee was shown a still image of the novelty $1,000,000 bill taken from the "Tent" series video, and stated she recognized it as being printed for the 2000 conference at Star Ranch. The employee stated that VICTIM's parents worked in the kitchen during the Southwest Sunbathing Association Conference, which allowed their children to be unsupervised at the Star Ranch for hours in a row. The employee described VICTIM as very mature and responsible for her age. Even at age 11, VICTIM understood her privacy and was very protective of her body. The employee stated if VICTIM was the victim of an abuse, she believes it would have to be "someone she knew very well and trusted." The employee stated VICTIM last spent time at the Star Ranch in the summer of 2008 with her family and her boyfriend. The employee stated videotaping is prohibited at Star Ranch but photographs are permitted if parents or legal guardians sign an approval document.

    11.    On October 28, 2009, an FBI agent interviewed VICTIM.

        a.    VICTIM stated she was sexually assaulted on two occasions while at the Star

---

[2] I know the full identity of the female victim, but have not included it in this Affidavit to protect her privacy, insofar as she was a minor at the time of the alleged crimes. VICTIM was born in 1989.

Ranch in McDade, Texas. VICTIM identified the individual who assaulted her as "DAVID," but did not recall his last name. VICTIM described DAVID's appearance at the time of the assaults as a taller white male, with light brown hair, approximately mid-thirties in age, with athletic fit build and a goatee. DAVID was at the Star Ranch with his wife "KERI," their son, and DAVID's niece, who was approximately 8 years old at the time. VICTIM's family became friends with DAVID because VICTIM was friends with DAVID's niece at the time. VICTIM knew that DAVID and "KERI" were later divorced, and that "KERI" was remarried to an individual who VICTIM identified by first and last name.

        b.     VICTIM stated the assaults occurred during a summer visit to the Star Ranch when she was approximately 9 years old. The first assault occurred during the daytime and inside DAVID's vehicle, which was parked outside and in front of DAVID's tent. VICTIM described the vehicle as a SUV/Jeep-type vehicle that was a dark color, either dark blue or dark green. DAVID and his family were staying in a tent at the Star Ranch at that time. The vehicle was parked in a very secluded area. VICTIM stated that DAVID's niece was also in the vehicle at the time of the assault. VICTIM and DAVID's niece were in the cargo area of the vehicle and DAVID was positioned between the two middle seats. DAVID instructed both girls to undress. Both girls did as they were directed by DAVID. DAVID said he was not pleased and told the girls they undressed too quickly. DAVID instructed the girls to get dressed and then undress again, but very slowly. Again, both girls did as they were directed by DAVID. VICTIM recalled that DAVID inserted his finger into VICTIM's vagina. VICTIM believed DAVID did the same to his niece. VICTIM recalled that DAVID showed the girls a camera during the incident. VICTIM estimated they were inside DAVID's vehicle for approximately 25 to 30 minutes, with the assault occurring during the last 15

minutes they were inside the vehicle. After the assault, DAVID instructed the girls to get dressed, which they did, and he further instructed them not to tell anyone about the assault.

      c.    VICTIM believed the second assault occurred during the daytime and in a cabin DAVID had purchased at the Star Ranch. VICTIM could not recall why she had gone to the cabin with DAVID and his niece. VICTIM recalled that she and DAVID's niece were nude and laying side-by-side under a blanket. The blanket was covering them from their heads to their waists. VICTIM could not see DAVID during the assault due to the blanket covering her head. VICTIM recalled DAVID's niece was giggling and laughing and seemed okay with what was occurring. DAVID's niece started telling VICTIM, as it was happening, that DAVID had inserted his finger into the niece's vagina and then performed oral sex on his niece. DAVID then inserted his finger into VICTIM's vagina and performed oral sex on VICTIM. VICTIM recalled that DAVID asked his niece if it felt good. VICTIM could not recall DAVID's niece's response. DAVID then asked VICTIM "what about you?" or words to that effect. VICTIM responded that she didn't know. DAVID then asked VICTIM if she thought "this" – referring to his penis – would fit in "there," referring to VICTIM's vagina. VICTIM responded "no." VICTIM did not engage in sexual intercourse with DAVID on that occasion, or at any other time. VICTIM estimated they were in the cabin for no more than one hour. DAVID instructed both girls not to tell anyone what had happened or they would get in trouble. VICTIM does not recall ever seeing any type of camera during this incident and did not know if the incident had been recorded. VICTIM stated that DAVID did not threaten either of the girls during either incident, but he did instruct them not to tell anyone of the incidents or they would get in trouble.

      d.    VICTIM saw DAVID when the VICTIM and her family returned to the Star

Ranch the following summer, when VICTIM was approximable 10 years old. DAVID did not have his niece with his family during that visit. At that time, DAVID approached VICTIM and asked VICTIM if she would like to go with him to his cabin. VICTIM told DAVID that she did not want to go and that what they had done was wrong and that it was bad. DAVID did not sexually assault VICTIM during that visit to the Star Ranch. VICTIM stated other attendees at the Star Ranch noticed DAVID following VICTIM around the Star Ranch. VICTIM recalls this was reported to Star Ranch officials and DAVID was expelled from the Star Ranch the same day. At that time, VICTIM did not notice DAVID following her, but she recalled being questioned whether something had happened with DAVID. VICTIM did not report the sexual assaults to anyone at that time, and had never done so (or otherwise made outcry) until the interview with the FBI Special Agent.

12. On April 1, 2010, VICTIM was interviewed by a FBI Forensic Child Interview Specialist. This interview was audio and video recorded. I observed this interview via closed circuit television (CCTV) from an adjacent room and have also reviewed the video recording of the interview. The following is a summary of additional information provided by VICTIM during the interview:

    a. VICTIM further identified "DAVID" as DAVID DIEHL. VICTIM stated that when she was between the ages of 8 and 10, DAVID DIEHL put his finger into her vagina on multiple occasions, while they were at the Star Ranch in McDade, Texas. VICTIM identified these incidents as having occurred in DIEHL's car, DIEHL's tent, and DIEHL's cabin. VICTIM stated DIEHL has to have scars on his body because he used to ride motorcycles and remembers he had wreck one summer. VICTIM stated DIEHL was at the Star Ranch that summer and she noticed he had scratches on his upper arm and his side. DIEHL had bandages on the side of his torso and was

on crutches. VICTIM stated DIEHL told her he broke his leg.

   b. VICTIM was shown multiple still images that were taken from one of the "Tent" series videos. VICTIM positively identified herself as being the girl depicted in the images. VICTIM identified six of the images of herself as being inside DIEHL's tent and two of the images of herself as being in DIEHL's car. VICTIM identified a still image of a hand taken from one of the "Tent" series videos as being the hand of DIEHL. VICTIM identified DIEHL's hand by the injury on the hand that DIEHL suffered from his motorcycle accident.

  13. On or about January 7, 2010, an FBI Special Agent interviewed KERRY JENKINS,[3] the ex-wife of DAVID A. DIEHL. MS. JENKINS stated that she was married to DAVID DIEHL from 1996 to 2002. MS. JENKINS and DIEHL have a son, who is now 13 years old. MS. JENKINS was 15 years old when she began a relationship with DIEHL, who was 31 years old at the time. MS. JENKINS became pregnant and her parents granted legal consent for her to marry DIEHL. MS. JENKINS stated DIEHL was physically and verbally abusive to her during their marriage. According to MS. JENKINS, DIEHL was arrested in Georgia and Ohio due to complaints from her of abuse. DIEHL did not serve any prison time for these arrests. DIEHL has thrown MS. JENKINS, pulled her hair out, and kicked her in the ribs. The abuse was the primary reason for their divorce in 2002. MS. JENKINS stated DIEHL works as a computer programmer and has much more money than she does. Due to his financial means, he was able to keep primary custody of their son after the divorce. MS. JENKINS has frequent visitation rights but does not have means to fly to Florida to visit. While splitting property after the divorce, DIEHL gave MS. JENKINS a video camera which still had a cassette tape inside. MS. JENKINS later looked at the

---

[3] KERRY JENKINS also spells her first name as "Keri."

AFFIDAVIT / COMPLAINT / DIEHL                                  Page 12

tape and it contained images from inside DIEHL's niece's bedroom and from an angle which appeared to conceal the camera. When confronted with this, DIEHL stated he was trying to see if his niece was being mean to her friends. MS. JENKINS could not identify any specific instances of child abuse from DIEHL but believed that his interest in young girls, evidenced by his relationship with her (MS. JENKINS), continues. Before they were divorced, DIEHL would state that she (MS. JENKINS) is "too old for me now." MS. JENKINS identified DIEHL's current address as 1711 Rustling Drive, Orange Park, Florida, which she knows because of their child custody arrangements.

14. On or about February 5, 2010, FBI Special Agents interviewed KERRY JENKINS.

a. MS. JENKINS was asked to listen to an audio clip that was taken from one of the "Tent" series videos. MS. JENKINS identified the male voice in the audio clip as that of DAVID DIEHL. MS. JENKINS was 80 to 90 percent sure the female voice in the audio clip as that of VICTIM. MS. JENKINS was then shown three images that were cropped from the "Tent" series videos that contained pictures of the hand of the individual who is depicted as engaging in sexually explicit conduct with VICTIM in the "Tent" series videos. MS. JENKINS identified all three images as depicting the hand of DAVID DIEHL. MS. JENKINS identified the images based upon distinguishing marks that were on the heel of the hand, the discolored fingernail on the ring finger, and the "broken" tip of the middle finger. MS. JENKINS stated these injuries were a result of a motorcycle accident that DIEHL suffered in either 1999 or 2000. She stated the accident occurred in the vicinity of Lime Creek Road and FM (Farm-to-Market Road) 2769 in Travis County, Texas. MS. JENKINS stated she took DIEHL to Seton Northwest Hospital in Austin, Texas, for treatment after this accident. MS. JENKINS also identified a pillow in a still image taken from one of the

"Tent" series videos as being a part of a comforter set she owned.

  b. MS. JENKINS stated from that from 1998 to 2000, she and DIEHL were the guardians of DIEHL's niece, whom she identified[4], while they lived at a residence on Hazelhurst Drive in Austin, Texas. MS. JENKINS felt that DIEHL had an unnatural fixation with his niece because he would have his niece model her clothes for him.

  c. MS. JENKINS stated that she and DIEHL had owned the following vehicles at various times throughout their relationship: (1) a white Honda Civic DX with grey cloth interior; (2) a green Oldsmobile Aurora with tan leather interior; (3) a black Volkswagen Jetta with grey cloth interior; (4) a blue Honda Odyssey with grey leather interior; and (5) a greyish Honda Odyssey with grey cloth interior.

  d. MS. JENKINS stated she did not believe she was at the Star Ranch for the Southwest Sunbathers Conference in 2000 because she had just moved to Ohio with her son. MS. JENKINS believed that DIEHL visited the Star Ranch after she moved to Ohio and he may have gone to the conference in 2000.

  e. MS. JENKINS stated that she and DIEHL owned two video cameras at the time of their divorce in 2002. DIEHL initially took possession of both video cameras, but months after the divorce was final, DIEHL sent the older of the two video cameras back to MS. JENKINS for her use. MS. JENKINS provided this video camera to Special Agent Mullen. The video camera is a JVC digital camcorder model GR-DVF10U. Inside the video camera was a Maxell MiniDV digital cassette tape. MS. JENKINS advised DIEHL shared a file server with a man (MS. JENKINS

---

[4] I know the identity of DIEHL's niece, but have not included it in this Affidavit to protect her privacy, insofar as she was a minor at the time of the alleged crimes.

AFFIDAVIT / COMPLAINT / DIEHL                                          Page 14

did not know this man's name) in Florida who was recently arrested for child pornography. According to MS. JENKINS, DIEHL wrote a computer program called "Retriever" that used the File Transfer Protocol (FTP) to download files, usually images, from file servers. MS. JENKINS could not provide any further information regarding this computer program. MS. JENKINS stated she knew DIEHL was into "normal" adult pornography and that sometimes he mentioned necrophilia and bestiality.

    15.    On or about March 17, 2010, I reviewed the MiniDV cassette tape that was provided by KERRY JENKINS. The video tape was approximately 1 hour and 2 minutes in length. The first 22 minutes (approximately) of the video were of an outdoor wedding. There was then a segment of video of a minor female, believed to be DIEHL's niece, modeling clothing. There were also various segments of home video containing recordings of various people including MS. JENKINS and children. Approximately 35 minutes into the video, there is a segment showing a minivan, a red motorcycle, and a Oldsmobile Aurora. Approximately 36 minutes and 42 seconds into the video, the camera appears to be placed in a bedroom and is faced towards a closet in the room. The mid-section of a person is observed along with a left hand with a ring on the ring finger placing something near or around the lens of the camera in what appears to be an attempt to conceal the camera. Approximately 39 minutes and 15 seconds into the video, what appears to be the same person is seen in the video adjusting something near or around the camera. Approximately 39 minutes and 33 seconds into the video, a face is partially seen close to the camera. The person is wearing glasses and appears to have short hair. Approximately 45 minutes and 30 seconds into the video, the same person is seen again quickly looking into the camera and then the camera is adjusted again. Approximately 51 minutes and 12 seconds into the video, two minor females are seen

entering the camera view and one of them undresses down to her underpants. Approximately 52 minutes and 46 seconds into the video, the other female kicks near the camera and the screen goes black. The screen stays black until the end of the video.

16. On or about March 5, 2010, through records received from Seton Northwest Hospital, Austin, Texas, I learned that DAVID A. DIEHL was treated at Seton Northwest Hospital's emergency room on June 13, 2000, for injuries sustained in a motorcycle accident. The records noted that DIEHL sustained multiple abrasions of the abdomen, left upper extremity (i.e., arm, forearm, and hand), left lower extremity (i.e., leg), swelling of right lateral malleolar (i.e., ankle), and a fractured rib.

17. Subsequently, I obtained and reviewed an incident report dated on or about August 7, 2000, from the Travis County Sheriff's Office, Austin, Texas (TCSO). The report stated that DIEHL was involved in an accident that occurred on June 13, 2000, at or near the intersection of Lime Creek Road and West Drive in Travis County, Texas.

18. Star Ranch records provided to the FBI indicate that DAVID DIEHL was at the Star Ranch from May 27-29, 2000; June 17-19, 2000; June 23-25, 2000; and on July 3, 2000. The documents included a registration form for "SS Star Ranch, Sponsored by SWSA Convention Sailing June 18th to June 24th 2000" with the name David and Kerri [sic] Diehl, 9007 Hazelhurst, Austin, Texas 78729, as arriving on June 23, 2000 and departing on June 25, 2000. The "total attending in family" field had the number "3" written in it. The form was signed with the names David A. Diehl and Keri L. Diehl on June 23, 2000. Star Ranch records also contained a receipt dated June 24, 2000, for food items purchased by "David Diehl," with the first name of VICTIM handwritten on the top of the receipt.

## CONCLUSION

19.   Based on the foregoing, there is probable cause to believe that DAVID A. DIEHL has committed the offense set forth in the attached Criminal Complaint.

FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

SEAN M. MULLEN
Special Agent
Federal Bureau of Investigation
Austin, Texas

Subscribed and sworn to before me at Austin, Texas, on this _5th_ day of April, 2010.

UNITED STATES MAGISTRATE JUDGE